We have a busy morning in front of us. We have four cases that have been set for argument this morning. We have one case that's been submitted on the brief. In the first case of Teva Pharmaceuticals v. Sandoz, which is related in part to Yale Research and Development v. Milan, we asked the parties to come prepared to discuss the effect of the Supreme Court opinion and SAS on this particular case in general, as to how the court should treat that opinion. And then, especially in this case, if there's a particular concern or issue with this case, then we'd like to hear that as well. So I'm going to ask the appellant to first address the issue and spend the time that you think is adequate in order to address the issue. We won't count that time against the merits of the case that we're here to hear. Correct. This would apply to the Yeda case and not the Teva case. So why don't we wait, and we'll do that for the Yeda case. Okay, so the first case is Teva Pharmaceuticals v. Sandoz. Mr. Quinn? Thank you, Judge Reynad. May it please the court, John O'Quinn on behalf of Teva. The district court's invalidity finding rises and falls with an obvious to try analysis that not even the defendants really tried to defend. That's the only analysis that the district court did. And it is an analysis that is riddled with inconsistencies, driven by hindsight, and fundamentally improper given all the unknowns surrounding glutarin or acetate. Now, to be clear, this court cannot avoid any of these issues regardless of what it decides in the IPR appeal that my colleague Mr. J will be handling. Because these are problems that apply to the 776 patent as well, which is not subject to an IPR. It's just that there are additional reasons why the district court erred with respect to the severity limitations at issue in that patent. Now, to take a step back, the district court's intent... Sure, were we to affirm in the other case then all of the issues except those pertinent to the 776 would go away, correct? No, Judge Bryson. I think that the other patents would go away. The other patents would go away. All right, when I said issues, I meant the other patents. Yes, the other three patents would go away, Judge Bryson. Those issues that pertain to the 776 would remain in the case. Well, the issues that are specific to the 776, addressing the severity limitations, and the issues that I intend to address more broadly about why this was an improper, obvious-to-try analysis because of the fundamental unknowns surrounding glutarin or acetate, those arguments would all still apply as well. Obviously, in the IPR, there wasn't an obvious-to-try analysis. And the district court's attempt to shoehorn this case for all of the patents, including the 776, into the framework of finite, predictable solutions required for an obvious-to-try analysis simply does not work because it's, A, generally improper for the chemical and medical arts, as ISI and Sanofi both recognize, and it's particularly inappropriate here because of the fundamental unknowns about glutarin or acetate. The optimal dose was unknown. The mechanism of action was unknown. The active species was unknown. The dose-response curve was unknown. And the pharmacokinetic-pharmacodynamic profile was unknown and likely unknowable. And that's what makes this case look like cyclobenzaprine and not like the Hoffman-LaRoche decision that the defendants rely heavily upon. In my review of the prior art, it appeared as if there were just two doses, dosage amounts that were being relied on, which was 40 milligrams and 20 milligrams. Were there others? There were, Judge Stolz. So it's true that the large-scale studies had been done on the 20-milligram and 40-milligram doses. But if you look, for example, Cohen reports, and this is Appendix 2389, that two and three milligrams were tested. Five milligrams at different dosing frequencies had been tested.  and demonstrated benefit on some endpoints. That's Appendix 2390. And TEPA itself, the record reflects, was considering a number of options when it decided to test the 40-milligram three times per week, including 50 milligrams once or twice a week. And that's reflected in Appendix 4075. When you refer to large-scale studies, what are you referring to? Like Phase III trials. So the fact is, though, that the options that were available to a person of ordinary skill in the art at the time were literally infinite. There was no reason to limit. In Phase III studies, were there any other dosage amounts that had been studied? Judge Stolz, I'm not aware of any other doses in Phase III studies. And I'm not aware of this court ever suggesting that having done Phase III studies is necessary or appropriate for limiting the scope of the art for purposes of what would be considered an obvious-to-try analysis. And indeed, that's exactly the kind of reverse reasoning that this court rejected in Honeywell v. Mexican. The fact that fewer doses had been tested is not a reason to limit the universe to 20 and 40. It is a reason to expand the universe to consider other testing, the testing of other doses, the testing of other methods of administration. And that's exactly why it took some 13 years to develop this particular dosing regimen as compared to what had been approved by the FDA at 20 milligrams every day. And I think it also brings to bear an inconsistency in the district court's reasoning. The district court says, well, I'm going to look only at these two doses, 20 and 40 milligrams, because they've been extensively tested, while at the same time saying, well, a person of ordinary skill in the art wouldn't consider 20 milligrams exclusively, even though there was certainly evidence that it was the optimal dose. And at the same time, you have the inconsistency of the district court looking at known and tested dose amounts, but only untested dosing frequencies. That is entirely inconsistent, and again, the type of reverse reasoning... Let me go back to a statement you just made. You said that the 20 was the optimal dose, but there is certainly evidence in the record that 40 had the advantage of faster onset. It seems to me in a progressive and serious disease, faster onset is a not negligible consideration. So Judge Bryson, I appreciate you highlighting that, because that comes to yet another of the inconsistencies in the district court's reasoning. Well, before you get to the inconsistencies, this is an advantage of the 40 milligram dosage, is it not? Well, Judge Bryson, it might be an advantage to dosing 40 milligrams every day, but there's no evidence that it is an advantage to dosing 40 milligrams three times a week. When 40 milligrams is being dosed every day, that's 280 milligrams per week. The dosing regimen here is only 120 milligrams per week. That's less than the 140 milligrams per week that was in the 20 milligrams every day. So the district court is simultaneously saying, well, there's an advantage to early dosing, but there's also an advantage to pursuing a dosing amount that on a per week basis ends up being essentially similar to what had been previously approved by the FDA. Those two don't exist in the same world. They're inconsistent, and there's nothing in the record. It gets back to the fundamental unknowns about... Well, isn't this just a question of balancing, though? I mean, you have certain advantages to the 40 milligram. You have certain advantages to the every other day. And why is that not simply a matter of deciding that you will balance off the advantages by going to something like 40 every other day or, alternatively, 43 times a week, which is pretty close to 40 every other day. So, Judge Bryson, I think that involves assuming and basically making the very kind of sort of inherently contradictory rationale that this court criticized in cyclobenzaprine because it assumes you know more about how this drug works than the prior art actually reflects. And, indeed, there is nothing to reflect. You have the clinical results that tell you something about how it works in that you understand something about onset efficacy. You understand something about side effects. Why isn't it reasonable to say, with respect to the competing clinical outcomes, that you'll try to balance the advantages and disadvantages of various dosages and dosing regimens? So, Judge Bryson, you don't know that there's early onset with dosing 40 milligrams three times a week. There is nothing about that that you know. You do know that 40 milligrams, there's considerable evidence that 40 milligrams does give you earlier onset. You may not know why. That's my point, Judge Bryson, is that all you know is that dosing 40 milligrams every day gives you early onset. Right. So that's a data point that you start with. So you say, okay, 40 milligrams, that's an advantage. Now, do we want to compromise that advantage, potentially, by getting another advantage that comes with less frequent than daily? Why isn't that a reasonable way to look at the question? Well, I think two things, Judge Bryson. First, even if you think that it might be obvious to experiment in the way that you are describing, this court is clear in cyclobenzaprine and in leopharmaceuticals, and this is page 1070 of cyclobenzaprine. But cyclobenzaprine was a bioequivalence case. We don't have that here, correct? Correct. So just to finish the thought with Judge Bryson, it is not enough that there be a motivation to experiment. You've got to have a reasonable expectation of success unless you're in the world of obvious to try, and nothing about the balancing that you just described explains why you would limit the options. To your point, Judge Reyna, yes, it's true the issue in cyclobenzaprine was about bioequivalence, but the fundamental point that cyclobenzaprine was making, and I think what makes this case distinct from Hoffman-LaRoche, is there must be a reliable basis for extrapolating from what is known, and that's what you don't have in this case. In LaRoche's case, we knew that there was only one or two doses were shown to be safe and effective, and one of those two doses was a 40 milligram, and the timing is finite, too. There's only seven days in the week. So, Judge Reyna, built into that question are so many assumptions. Why are you assuming that there's only 20 and 40 milligram doses? And, indeed, again, that's what was being asserted in terms of prior art here, but the fact is there are other dosing amounts that had been tested that were being considered, and it is purely through hindsight and, indeed, egregious hindsight to go back and limit. Why do you go beyond, for example, Pinchese? Starting with Pinchese as your primary reference, why do you need to go beyond that when it discloses either 20 milligram or 40 milligram and says that you could have a daily or every other day dosage amount or dosage schedule? So, Judge Stoll, I think with respect to the Pinchese reference, that's how I've heard it, or Pinchese, at the end of the day, question number one is why do you start with that in the first place? And this court in WBIP versus Kohler and in ISI and in Daiichi versus Matrix has made clear you've got to have a reason, by clear and convincing evidence, for why you're going to start with a primary reference. And it is purely hindsight. Indeed, the whole concept of closest prior art is a hindsight-driven concept under the Graham factors for deciding whether or not there were unexpected results, not why does a person of ordinary skill in the art pick it in the first place. And here, of course, you have an untested dosing regimen, 40 milligrams every other day, from an abandoned patent application, and you have Forte teaching you that there is no reason to use 40 as opposed to 20 because you don't get better results. And to one of the points you were asking, Judge Bryson, that is you don't get better results over the long haul. And one of the questions that you asked, when you start combining things, the prior art taught that you have more adverse events using 40 milligrams, that's Appendix 2418, and you have more adverse events and, indeed, higher dropout when you dose every other day, that's Appendix 2439. Are you talking about the Flexter Table 5? Yes. Well, your time is short, and I don't want to draw you into a detailed discussion of that, but at minimum, that table, it seems to me, doesn't show a statistically significant difference. You would agree with that, would you not? I would agree that the Flexter itself isn't, and so the whole idea of having, of the every other day, I agree that Flexter itself doesn't give you statistics. The comparison is between Flexter and Miner, right? That's right. And Miner is a much larger study, but Flexter is a small study, and Miner's incidence rate for the alternate and every day were very close. So statistically, even in Table 5, so statistically there's no significant indication that alternate is worse in terms of side effects, correct? Well, Judge Bryson, I guess I'd answer it this way. To the extent that you think that Flexter teaches anything in a statistically significant way, and I would dispute that it does in terms of the every other day. It teaches fewer dropouts. It does teach fewer dropouts. You would agree with that? It teaches fewer dropouts at 20, not due to adverse events. I would not agree with that. There are more dropouts due to adverse events, as opposed to dropouts because they lost track of somebody or some other reason. More dropouts due to adverse events with 20 every other day. I realize I'm in my rebuttal. Let me make a couple of quick points with respect to the severity limitations of the 776 patent because that patent requires reduced severity, not just reduced frequency. These are different concepts as the district court acknowledged, but at the same time, the district court then relies on testimony that it believes, quote, conflates frequency and severity. That's Appendix 44. Now respectfully, that's not clear and convincing evidence of obviousness. Again, that's internally inconsistent reading. In any event, the only point from the testimony of Dr. Fox was that in the abstract, if you reduce the frequency of a particularly severe event, you could reduce the overall severity of adverse events, but he never suggests that you will get that if you have an increase from 20 to 40 milligrams. Similarly, the district court's reliance on a press release, and to say a person of ordinary skill in the art would consider that to the degradation of the underlying data doesn't make sense. In any event, all the press release shows is maintaining tolerability, not reducing severity, and you need the reduction. Let me stop you there so you'll have a little bit of time for rebuttal because we'll want to hear back from you. I'll restore you back to the four minutes of your time. So let's hear from the other side now. Thank you, Judge Reynolds. Now you've divided your time between you and Counselor Maynard. Is that correct? Yes, Your Honor. And you're going to speak for eight minutes? Yes, Your Honor. Roughly half. Seven minutes? Okay. Thank you, Your Honor. May it please the Court, Shannon Bloodworth representing Mylan. And just to pick up on something that was just discussed, the Forte study, and it was presented to the district court and found that the Forte study with 20 milligrams and 40 milligrams daily had the same adverse events. They were very similar, and that's Appendix 20422. So in the prior art, you have 20 milligrams and 40 milligrams, both well-tolerated and both with the same adverse events. You have reduced frequency that has been proven also to be efficacious in the Kahn 2008 study, as well as in the Fletcher study. And Your Honor asked about the Fletcher study. It did have a statistically significant, I guess, reduction in dropouts with the 20 milligram every other day versus the minor 20 milligram daily. And, of course, that's a big point to the prior art, which here the concern is, are patients going to be adherent to their medication? And adherence is, do you take it? And if you don't take it, are you going to stay compliant on it? And so that was the problem with the prior art. It caused injection site reactions. And this was all presented to the district court. It was a seven-day bench trial with dozens of witnesses and a 50-page opinion that addresses these very issues. And those factual findings were made in defendant's favor. The injection site reactions, that's related more to frequency, correct? It is, Your Honor. Okay. It is related, although Dr. Fox testified on his direct examination that if you reduce a severe reaction such as lipoatrophy, if you reduce the frequency of that reaction, you reduce the severity and you improve the tolerability. And so, again, the goal was improved tolerability. So that's the motivation to go from every other day regimen or a daily regimen to something that is three times a week? The motivation to do that is what Dr. Green testified in the district court credit is, which is that patients were more compliant and had better adherence when they took their drug Monday, Wednesday, Friday. They knew every day of the week what they were going to take, and they got their weekends off. And that makes sense, and the adherence increases. And that was the district court credit in Dr. Green's testimony on that score as well as citing an adherence project that occurred in a clinical study called Devonshire. And the Rebif three times a week had better adherence than the Capaxone daily in that study. And the district court heard a lot of factual argument about this from both sides' experts, and the district court credited Dr. Green and Myelin's expert on those scores. Also, the court asked a question about starting with 20 versus 40, and I believe my colleague answered that there were many doses in the ART. There weren't many doses in the ART. The studies he referred to in the Cohen study, and if you wanted to look at that, but they are very small dose studies that were back in 1977 for whether or not you would even be able to have an efficacious treatment, and they were not in the ART. Capaxone was approved as a 20 milligram daily dose in 1996, and even through 2008 and the priority date of 2009, it was still unclear what the optimum dose was. So there are clinical trials studying 20 milligram dosing and 40 milligram dosing, and those are the predictable, identifiable choices that the district court selected and which was confirmed by his discussion of the scope and content of the prior ART. And, of course, we know from the Pincazi application that Pincazi already combined the two concepts, and it was not hindsight. The district court went through the scope and content of the prior ART, and he analyzed all of the ART starting at page 23 of his opinion. And I'm sorry, Your Honors, it's A23. The pages are one off. So it's A23 through A33. And at the end of that discussion, after going through all of the ART, he said Pincazi would be the starting point. What about Mr. O'Quinn's argument that it's improper simply to start with Pincazi without a good reason to start with Pincazi, WBIP? Two responses, Your Honor. First of all, this is a method of treatment claim, not a lead compound case. But second of all, the district court didn't just start with Pincazi. I'm not sure that WBIP was a lead compound case, was it? I thought it was, Your Honor. Well, it could be. I don't recall. But in any event, the opinion seems to have expressed the notion in a broader form than simply a lead compound. But go ahead and just tell me why that is. To my second point was that the district court had already gone through the scope and content of the prior ART and had identified Pincazi as the starting point after doing so. So not starting with Pincazi because it was the closest prior ART. He went and identified, just like Graham tells you to do, the scope and content of the prior ART. And he said it would be the starting point. And it would be the starting point because by this time, clinical researchers had the Cohen study showing that the 40 milligram was effective and you have the Fletcher study showing less frequent dosing is similarly efficacious. And so the Pincazi was the culmination of those two. And that's where the arc of the ART was heading, to less frequent dosing to address the problem with injection site reactions and tolerability. And it wasn't hindsight. I disagree with that. I think that Graham tells the court, and this is what the district court did, to analyze the scope and content of the prior ART and compare that scope and content with the claimed invention. And when you do that, there's no doubt that Pincazi's 40 milligram every other day is the closest prior ART. Your opponent argues that the problem here is that this analysis was done without, this obvious analysis was done without a PKPD study and then asserts cyclobenzaprine to back up that argument. What's your response to that? Your Honor, my response is that cyclobenzaprine is an apostate here. And the point is, as I think the questioning pointed out, the claims in cyclobenzaprine were for a therapeutically effective plasma concentration. That is for a PKPD relationship, as the court construed the claims. And here we have clinical data. We have clinical data of a wide range of cells. So not only is it, we're not relying. You're not saying there's a PKPD study in this case. There's no PKPD relationship in this case, but that did not stop clinical researchers from experimenting with both the dosing and the dose frequency of GA, and nor would it. According to Dr. Green, clinical, the clinical researchers understand that this is a drug that works on the immune system. And your immune system has memory and persistence. And you would look at the clinical research and you'd look at the total weekly dose, 20 milligrams every other day in Fletcher, up through 40 milligrams daily in the Forte study. And you have a range of effective doses from 70 to 280. And you would want to pick the dose to address the compliancy and tolerability issues that was as close to the effective dose as you can. And the district court found as a fact that 40 milligrams three times a week was very close to the FDA approved dosing regimen. I'm actually your honors. I'm going to turn the podium over to Ms. Maynard. Thank you very much. Thank you. Thank you. Counsel Maynard. May it please the court. DM Maynard. I represent Sandoz and Memento. A lot of discussion here today about the evidence and the facts, but the district court had a trial and it made factual findings rejecting the assertions that Teva is making in this court. It rejected that 20 milligrams was the optimal dose. That is a finding the court made at A27 through 29. It rejected the claims that people would be dissuaded from using 40 milligrams because of supposedly more adverse events. That is the story the district court was told by Teva and the court rejected it at A28 to 29 and A35. The district court found that although the Forte and Cohen reported slightly more injection reactions and dropouts, those studies still showed that the 40 milligrams was safe and well tolerated and that persons of skill in the art would both be motivated and have reason to use it. The court made factual findings from which the only conclusion one can draw is that all of the asserting claims are obvious. The court found both that persons of skill in the art would be motivated to use a 40 milligram dose, would be motivated to do that three times a week and would have a reasonable expectation of success. The clearest statement of that is at the end of the court's opinion after it's considering the objective considerations of non-obviousness where the court concludes on A47. Both that the 40 milligrams three times a week would be motivated to be used and would be expected to succeed and that it would be expected to be more tolerable. Judge Rainio, with your question about frequency and severity, the district court's findings on the 776 patent are fully supported by the record. The court relied on Dr. Fox's testimony and this is at A... 5523? A44 to A45. Oh, okay. I thought you were quoting the appendix pages. Oh, so thank you, of Dr. Fox. Okay. Yes, that too, Your Honor. All right. So he relied on Dr. Fox's testimony that there are certain adverse events that are so severe that if one reduces the frequency of those events, one will, by definition, reduce the severity of adverse events. So here there's no information or no knowledge of how the precise mechanism of the GA works, correct? That's true, Your Honor, and that evidence was also presented to the district court. Teva claimed in the district court because of that that these claims couldn't be found to be obvious. The district court heard... Doesn't that leave you still with like a shot in the dark? If you don't know how the GA actually, the mechanism, how it's working, then aren't you just left with guesswork, and that guesswork can be, have unexpected results? Two points about that, Your Honor. One, again, the district court heard competing expert testimony about this from persons of skill in the art, including Dr. Klinger, who was the inventor, who testified at A3998 to 9, and the district court relied on that testimony in concluding at A43 that PK data is irrelevant with respect to this drug, which works on the immune system. Our expert, Dr. Green, testified at A4886 to 7, and the district court relied on Dr. Green, credited Dr. Green's testimony, that in the context of this drug, which works on the immune system, one would not look to PKP data. One would instead look to the clinical studies, and the clinical studies here showed and gave one of persons of skill in the art both the motivation to use and a reasonable expectation that it would work, 40 milligrams three times a week, for the reasons that my colleague said, which is that it allows people to dose Monday, Wednesday, Fridays, with the same total weekly dose as already approved, safe and effective by the FDA, and those findings are in the district court's opinion, so with respect to the PKPD and rejecting the mechanism of action, those findings are on A43, at the bottom, to A44, where the judge concluded, the fact that the PKPD profile is unknown is irrelevant here. GA is an immune-modulating drug, but is not necessarily measurable in the bloodstream, and even if it is, measuring the levels in the blood does not indicate anything about the effect of the drug on the patient. Our expert, Dr. Fox, testified that instead, persons of skill in the art would look to the clinical studies, and in fact that the clinical studies were strong evidence that no one was deterred, no one of skill in the art was deterred from the fact that they didn't know exactly how this drug works, from testing and using it in patients, less than every day, and in 40 milligram doses. What about the obvious to try point that the district court embraced? I think he even made it a heading in one portion of his opinion. He did, Your Honor, and it's one subheading in his whole entire obviousness discussion, and I think there's a couple points he made about that. One, as the Supreme Court has made clear, there's only one obviousness analysis. The question is, under Section 103, would a person of skill in the art consider what is claimed to be different enough? Would it be so similar to what they already know that it's obvious, the subject matter is obvious as a whole? And you can get to that inquiry a couple of different ways, and this court often looks to facts of motivation to use and a reasonable expectation of success, and if you look at it through that frame, the district court made ample findings here, and I'm happy to walk you through them all to find it on that grounds. The district court also, though, did look at the obvious to try analysis and found, and I think the question to emphasize is, it's identified predictable solutions, finite identified predictable solutions, and the identified predictable solutions were 20 milligrams and 40 milligrams, which had both been extensively studied. The district court did make a reference to the fact that it was looking to, that Teva was looking at two doses, but those two doses were the only ones that weren't anticipated by the prior art. The district court then went on to explain and make factual findings why a person of skill in the art would be motivated to take, to choose three times weekly, and that's based on our expert's testimony again, and that's because, and this is on page A38, the top paragraph, the second to last sentence, the total weekly dose the patient would receive under the new regimen was very close to the total weekly dose known for the approved 20 milligram everyday regimen, 120 milligrams a week versus 140 milligrams a week. So that's our expert's testimony that he's crediting Dr. Green again, A4883 to A4, and that a person of skill in the art would be motivated, and this court has held in cases like Allergan v. Sandoz that one can look to the FDA for possible motivation, and that a person, and Dr. Green testified that a person of skill in the art would look at the total weekly doses, that this was a forgiving drug, that as Mr. O'Quinn acknowledged, that successful dosage ranged from 70 milligrams to 280 milligrams, and that a person of skill in the art would be motivated to choose this particular regimen three times a week for convenience, again, and those findings, again, relying on our expert, as well as the Devonshire study about a drug Rebif, which had good patient adherence, A40, and also on the Kahn 2008 study, which studied 20 milligrams daily versus 20 milligrams every other day, and after two years, every single patient switched. I have one more question for you, which is do you have any additional thoughts on the argument being made about Pencasi being not, that the district court didn't have a basis for choosing it as the lead closest reference or lead reference? Well, I think Pencasi is virtually anticipatory here, Your Honor, and the district court recognized that persons of skill in the art would see that it was only two doses, that over the course of two weeks, you only have one dose difference, but I don't think the court looked at it as the lead compound way. The court, instead, marched through the art. Pencasi was the culmination, in a way, of the art to that point. There was art showing 40 milligrams had a faster onset of action, and there was art showing that you didn't need to give the drug every day, and Pencasi, TEVA, the vice president of research and development at TEVA, claimed in the Pencasi application that 40 milligrams every other day, and the district court found, based on that, and this is in its subheading called three times weekly, Your Honor, and this is where I think the court found that persons of skill in the art would have motivation and a reasonable expectation of success at 40 milligrams three times a day, that because this was only one dose off, Your Honor, that that would provide adequate motivation, and then that Pencasi was itself then later confirmed by the Forte study and studies that came after it. Okay. Thank you. Thank you. We'll restore you back to four minutes. Thank you, Judge Reyna. So starting on Pencasi, again, you have to look at it as the first act in a trilogy, and you have to look at it in light of what was subsequently learned in Forte, but regardless, the defendants say, oh, well, Pencasi is just a difference of one dose every two weeks. Well, what that allies is that is a difference of now having every week a 72-hour gap in dosing. There was no prior art, no experiments, no data on a 72-hour gap in dosing. Well, there was the half-life for the monkeys. Well, Judge Bryson, the point— 80 hours, I think, right? Am I wrong about that? I'm not sure about that specifically, Judge Bryson, but what I do know is that in terms of the prior art that they point to, there's no prior art in which there was a 72-hour gap in dosing that was shown both to be efficacious and to have the effects that are claimed here, and this is important because this is why the district court is forced to resort to an obvious-to-try analysis because for all they have to say about data, there is no data showing that this is going to be efficacious once you introduce a 72-hour gap. Meanwhile, there was plenty of testimony to the district court that explained why it was that having a constant activation was an important theory here, and our expert, Mr. Zimpson, describes this at Appendix 5189. Dr. Klinger talked about this at 3998 to 4000, and indeed, the Flechter prior art reference itself says, our results may indicate that the dose on alternate days already has a maximal effect, or it's possible the biologic effect is not dose-related, but it's related to the exposure of the immune system by its presence of the continuity of administering the drug. The point is, nobody knew, and you've now got a 72-hour gap that's being introduced. Nothing in the prior art teaches that, and the district court never finds, you will look at this opinion in vain to find a reasonable expectation of success when you've introduced the 72-hour gap. What the district court does is an obvious to try analysis. That's the only analysis it does, and the defendants don't even defend it. They didn't say a single word about it, either one of them, until they got a question from the court, and that's because they recognize it's a fundamentally flawed obvious to try analysis, and it's inconsistent with what this court has done in cyclobenzaprine. It's inconsistent with what this court recognized in Hoff and LaRoche that made it obvious to try. There, the court said that there was a... Obvious to try is not a separate obviousness inquiry. I mean, there's only... And this is something that your opponent said. There's only one obviousness inquiry, and included in that would be obvious to try. So I agree, Judge Reina, that after KSR, the court looks at obviousness writ large. This court, of course, has made clear in cyclobenzaprine, in Leo Pharmaceuticals, in Hoff and LaRoche, that there are some circumstances where an obvious to try analysis is proper, and sometimes where that type mode of analysis is legally improper, and that's my argument today, that there is a legally improper mode of analysis here, because what you don't have is something from which you can, quote, reliably predict the efficacy. In Hoff and LaRoche, you can reliably predict the efficacy depends on the total dose administered over a given period of time, and not the amount administered at any single point in time. Contrast that to the evidence at Appendix 2440, at Appendix 3999, and at Appendix 5189. It's exactly the opposite of what you had in Hoff and LaRoche. The fundamental unknowns here made it such that you can't just simply say that there is a reliable basis for extrapolating. Again, it doesn't matter whether there's PKPD data. The fact that there wasn't, the fact that it wouldn't perhaps be indicative, makes it worse. What you would need is something like dose-ranging clinical studies. And here, of course, you have the invention in which you are simultaneously adjusting two different parameters. You're changing the dosing amount, you're changing the dosing frequency, and there is nothing, not one single thing in the prior art to suggest that if you change both of those, that you can have a reasonable expectation of success. The data, certainly, that they point to doesn't support and doesn't identify, doesn't give a basis for the gaps and for the changes that are made, and that is why the District Court ultimately falls back on obvious to try, and that is legally improper, given the unknowns here in the art. Okay. Thank you, Mr. O'Quinn. Thank you, Judge Reynolds. We thank the party for the arguments in this case.